J-S38026-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| LEONALDO RIVERA | : | |
| | : | |
| Appellant | : | No. 3324 EDA 2024 |

Appeal from the PCRA Order Entered November 13, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003964-2015

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| LEONALDO RIVERA | : | |
| | : | |
| Appellant | : | No. 3325 EDA 2024 |

Appeal from the PCRA Order Entered November 13, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003965-2015

BEFORE:  McLAUGHLIN, J., KING, J., and BENDER, P.J.E.

MEMORANDUM BY KING, J.:                    **FILED DECEMBER 19, 2025**

Appellant, Leonaldo Rivera, appeals from the order entered in the Philadelphia County Court of Common Pleas, which dismissed his first petition filed under the Post Conviction Relief Act ("PCRA").[1]  We affirm.

A prior panel of this Court set forth the relevant facts of this case as

_____

[1] 42 Pa.C.S.A. §§ 9541-9546.

follows:

At trial, the Commonwealth presented the testimony of Philadelphia police detectives John Bartol and Thorsten Lucke, Philadelphia police lieutenant Pedro Rosario, Philadelphia police sergeant Joseph Stevenson, Philadelphia police officers Robert Flade and Christine Hilbert, deputy medical examiner Dr. Albert Chu, Leticia Buchanan of the Philadelphia police department's Firearms Identification Unit, and Aleida Garcia, Christian Ramos, Antonio Vicenty, and Valery Diaz. [Appellant] presented no evidence. Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence established the following.

On the night of Friday, January 23, 2015, at approximately 9:45 p.m., Alejandro Gabriell Rojas-Garcia,[2] the decedent, contacted his college friend, Christian Ramos, to inquire whether Ramos wanted to go out for drinks later that night. At around 1:00 a.m., the two agreed to meet at the A Lounge, an after-hours club, located on Macalester Street in Philadelphia, after Ramos finished work around 2:45 a.m.

> [2] Alejandro Gabriell Rojas-Garcia was also known as "Luchi."

Meanwhile, on that same night, at around 11:30 p.m., Antonio Vicenty, his girlfriend, Valery Diaz, her cousin Jesenia Moreno[3] and Moreno's friend Juliana Rodriguez,[4] went to a concert at 5th and Annsbury Streets in Philadelphia. Moreno was wearing a white dress at the time. While attending the concert, the four ran into [Appellant][5] and his friends. Vicenty, Diaz, Moreno, and [Appellant] all knew each other because they had grown up in the same town. Additionally, Moreno was in a romantic relationship with [Appellant]. After the concert ended, Vicenty, Diaz, Moreno, and Rodriguez went to the "A Lounge." When they arrived inside the club, they discovered that [Appellant] and his friends also had gone there from the concert.

> [3] Jesenia Moreno is also known as "Jese."

> [4] Juliana Rodriguez is also known as "Julie."

> [5] [Appellant] is also known as "Leo."

After getting off from work, Ramos arrived at the A Lounge at approximately 3:15 a.m. Ramos then entered the nightclub and met up with Garcia and a few other friends. While at the club, Garcia spoke to a woman in a white dress, presumably Moreno, the romantic partner of [Appellant], several times.[6]

[6] Ramos, who testified to the interaction between Garcia and "the woman in white," did not know Moreno. However, it is a fair inference from the evidence that Moreno was the woman in the white dress Ramos was describing in his testimony.

At around 4:30 a.m., Vicenty, Diaz, Moreno, Rodriguez, and [Appellant] left the night club and began walking toward their vehicles. Minutes after, Garcia and Ramos also left the A Lounge, planning to go to another club. When they were leaving the club, Garcia offered to drive Ramos to the next club. As the friends walked toward Garcia's car, Garcia walked ahead of Ramos and began talking to several women, including the woman in the white dress to whom he had spoken throughout the night. Garcia placed his arm around the woman's waist and the two were talking and laughing. After Ramos caught up to Garcia and the woman in white, the group continued walking toward Garcia's car. As they approached Garcia's car, two men across the street began yelling at them. Someone yelled at them in Spanish, "Do you want lead?" Garcia abruptly ended his conversation with the woman, told Ramos "let's go," and the two got into Garcia's car.

As Garcia drove out of his parking spot, [Appellant] fired 14 bullets at the driver's side of Garcia's car. A bullet struck Ramos under his left arm. Garcia was struck by at least four bullets. He had wounds on the left side of his face, the left side of his chest, his left thigh, his right forearm, and there was a bullet fragment injury to his left hip.

After the shooting started, Garcia's car spun out of control and crashed into a wall. As [Appellant] stood on the street and fired at Garcia's car, Vicenty stood approximately six to eight feet behind him on the sidewalk. Vicenty panicked and froze as he witnessed the shooting. Then he quickly got into

Moreno's rental car, which the other three women were already in, and said, "[H]e killed him." Immediately, they left and went back to Diaz and Vicenty's home.

After the car crashed, Ramos ran back to the nightclub and informed the security guard on duty of what had happened. A man offered to drive Ramos to the hospital in Ramos' car. On their way to Temple Hospital, the car hit a curb and sustained a flat tire. Ramos and the man then flagged down Sergeant Joseph Stevenson on 11th and Westmoreland Street, and Sergeant Stevenson drove Ramos to the hospital, where he received treatment for his injuries. Garcia was pronounced dead at the scene from multiple gunshot wounds.

Very soon after Vicenty, Diaz, Moreno, and Rodriguez arrived home, [Appellant] showed up at the house to pick up Moreno. When he arrived, Diaz asked [Appellant] about the shooting. [Appellant] told Diaz, "I killed him," and then smiled. Shortly thereafter, Vicenty came downstairs and asked [Appellant], "what the fuck happened?" [Appellant] did not respond. About fifteen to twenty minutes later, [Appellant] left with Moreno.

[Appellant] came back to Diaz and Vicenty's house later that same morning, January 24, 2015, and again told Diaz that he "did it" and had "killed him." Shortly thereafter, Vicenty again asked [Rivera] "what the fuck happened?" and [Appellant] again did not respond.

Philadelphia police detectives conducting an investigation of the murder released surveillance footage to the news media showing one man and three women, two of whom were wearing white, leaving the night club. Diaz saw the video on the news and told Vicenty about it. After recognizing themselves in the video and learning they were both persons of interest, Vicenty and Diaz went to the police station that same night. Detectives interviewed them the next morning and they identified [Appellant] as the shooter.

*Commonwealth v. Rivera*, No. 1700 EDA 2020, unpublished memorandum

at 2-5 (Pa.Super. filed October 29, 2021) (quoting Trial Court Opinion, filed

10/19/18, at 2-5).

The Commonwealth subsequently charged Appellant at two different docket numbers for the offenses against each victim. The cases were consolidated, and Appellant proceeded to a jury trial. Following trial, the jury convicted Appellant of first-degree murder, aggravated assault, and related offenses. On May 4, 2018, the court sentenced Appellant to life imprisonment for the murder conviction, plus a consecutive term of seven and one-half (7½) to twenty (20) years' imprisonment for the aggravated assault conviction. This Court affirmed the judgment of sentence on October 29, 2021, and Appellant did not seek further review.

Appellant timely filed a counseled PCRA petition on October 20, 2022. In it, Appellant argued that Attorney Link ("trial counsel") was ineffective for failing to move for a mistrial during the Commonwealth's closing argument and failing to call a witness to provide exculpatory testimony. The Commonwealth filed an answer to the petition on February 5, 2024. On March 15, 2024, the court denied relief on Appellant's claim regarding trial counsel's failure to move for a mistrial. Nevertheless, the court ordered an evidentiary hearing to explore the claim of ineffectiveness for failing to call a witness.

The court conducted the evidentiary hearing on May 16, 2024. At that time, the court received testimony from trial counsel and Appellant. The court also received testimony from Angel Rosa-Ramos, who testified that he was with Appellant on the night of the shooting, and Appellant was not the shooter.

(*See* N.T. Hearing, 5/16/24, at 48-49). During the hearing, PCRA counsel made an oral motion to amend the PCRA petition by adding an additional ineffectiveness claim.[2] The court granted this request. (*Id.* at 47). On May 22, 2024, the court granted relief by vacating Appellant's convictions and judgment of sentence and ordering a new trial.

The Commonwealth filed a motion for reconsideration on Monday, June 3, 2024. The Commonwealth argued that "trial counsel conducted a reasonable investigation into Rosa-Ramos' potential testimony prior to trial, and the record reflects that counsel had a reasonable basis not to call him as a witness." (Motion to Reconsider, filed 6/3/24, at 1). The court granted reconsideration and conducted another evidentiary hearing on October 11, 2024. At that time, the court received testimony from Attorney Szantos, who served as "second chair" for Appellant's defense team. The court also heard from Attorney Shuttlesworth, who assisted with trial counsel's investigation

_____

[2] At the hearing, PCRA counsel played a surveillance video from the nightclub on the night of the shooting. The video showed security staff frisking Appellant and Mr. Rosa-Ramos as they entered the nightclub. (*See* N.T. Hearing, 5/16/24, at 55-56). PCRA counsel claimed that trial counsel did not show this video to Appellant prior to trial, and Appellant decided not to testify at trial. Thus, PCRA counsel argued that Appellant "could not make a reasoned decision whether he should testify and/or whether or not to call witnesses because he never actually saw some of the evidence." (*Id.* at 45).

into Mr. Rosa-Ramos.[3] By opinion and order entered November 13, 2024, the court dismissed Appellant's PCRA petition.

Appellant timely filed separate notices of appeal at each docket number on December 10, 2024. On December 12, 2024, the court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Appellant timely filed his Rule 1925(b) statement on December 20, 2024. On March 24, 2025, this Court consolidated the appeals *sua sponte*.

Appellant now raises the following issues for our review:

> Whether the PCRA court—in violation of the 6th and 14th Amendments to the Constitution of the United States, Article I, Sections 1 and 9 of the Pennsylvania Constitution, and Commonwealth and federal notions of Due Process—erred [in] denying [Appellant's] claim of ineffective assistance of counsel insofar as:
>
> > a. trial counsel failed to call an exculpating witness;
> >
> > b. trial counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision by Appellant to testify on his own behalf; and
> >
> > c. trial counsel failed to request a mistrial during closing argument.
>
> Whether the PCRA court erred by failing to recognize that the cumulative errors denied [Appellant] of a constitutionally fair trial, was a miscarriage of justice, and thereby a new trial was warranted.

(Appellant's Brief at 10-11).

---

[3] At the time of trial, Mr. Rosa-Ramos was in custody in New Jersey. Trial counsel utilized Attorney Shuttlesworth to take a material witness order to the relevant authority in New Jersey. (*See* N.T. Hearing, 10/11/24, at 50-51).

We will address each of Appellant's ineffectiveness claims individually. First, Appellant contends that Mr. Rosa-Ramos "existed as a witness and was ready and willing to testify had trial counsel called him to the stand." (*Id.* at 27). Appellant asserts that he was with Mr. Rosa-Ramos at the nightclub, and Mr. Rosa-Ramos watched security staff frisk Appellant before he entered the premises. Appellant claims that he and Mr. Rosa-Ramos left the nightclub together, and they fell to the ground when the gunfire erupted. Appellant also emphasizes Mr. Rosa-Ramos's testimony from the PCRA hearing that no one in Appellant's group possessed a firearm. Based upon the foregoing, Appellant insists that trial counsel should have presented Mr. Rosa-Ramos as a defense witness at trial:

> It simply cannot be overstated that at trial Antonio Vicenty was the only fact witness who testified that he saw [Appellant] shoot the decedent. Under such circumstances, the absence of Mr. Rosa-Ramos's testimony was so prejudicial as to have denied the defendant a fair trial.

(*Id.* at 32). Appellant adds that "there is no justifiable reason for trial counsel's failure to call Mr. Rosa-Ramos at trial," and "Mr. Rosa-Ramos's testimony would have been favorable because it would have raised reasonable doubt that [Appellant] committed the murder." (*Id.* at 35). Appellant concludes that trial counsel was ineffective for failing to call Mr. Rosa-Ramos as a trial witness. We disagree.

"Our standard of review of the denial of a PCRA petition is limited to examining whether the evidence of record supports the court's determination

and whether its decision is free of legal error." ***Commonwealth v. Beatty***, 207 A.3d 957, 960-61 (Pa.Super. 2019), *appeal denied*, 655 Pa. 482, 218 A.3d 850 (2019). "[W]e review the court's legal conclusions *de novo*." ***Commonwealth v. Prater***, 256 A.3d 1274, 1282 (Pa.Super. 2021), *appeal denied*, 672 Pa. 30, 268 A.3d 386 (2021).

> Traditionally, credibility issues are resolved by the trier of fact who had the opportunity to observe the witnesses' demeanor. A PCRA court passes on witness credibility at PCRA hearings, and its credibility determinations should be provided great deference by reviewing courts.

***Beatty, supra*** at 961 (internal citations and quotation marks omitted).

"Counsel is presumed to have rendered effective assistance." ***Commonwealth v. Hopkins***, 231 A.3d 855, 871 (Pa.Super. 2020), *appeal denied*, 663 Pa. 418, 242 A.3d 908 (2020).

> [T]o establish a claim of ineffective assistance of counsel, a defendant must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. The burden is on the defendant to prove all three of the following prongs: (1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different.

***Commonwealth v. Sandusky***, 203 A.3d 1033, 1043 (Pa.Super. 2019), *appeal denied*, 654 Pa. 568, 216 A.3d 1029 (2019) (internal citations and quotation marks omitted). The failure to satisfy any prong of the test for ineffectiveness will cause the claim to fail. ***Commonwealth v. Chmiel***, 612

Pa. 333, 30 A.3d 1111 (2011).

"The threshold inquiry in ineffectiveness claims is whether the issue/argument/tactic which counsel has forgone and which forms the basis for the assertion of ineffectiveness is of arguable merit." *Commonwealth v. Smith*, 167 A.3d 782, 788 (Pa.Super. 2017), *appeal denied*, 645 Pa. 175, 179 A.3d 6 (2018) (quoting *Commonwealth v. Pierce*, 537 Pa. 514, 524, 645 A.2d 189, 194 (1994)). "Counsel cannot be found ineffective for failing to pursue a baseless or meritless claim." *Commonwealth v. Poplawski*, 852 A.2d 323, 327 (Pa.Super. 2004) (quoting *Commonwealth v. Geathers*, 847 A.2d 730, 733 (Pa.Super. 2004)).

"Once this threshold is met we apply the 'reasonable basis' test to determine whether counsel's chosen course was designed to effectuate his client's interests." *Commonwealth v. Kelley*, 136 A.3d 1007, 1012 (Pa.Super. 2016) (quoting *Pierce, supra* at 524, 645 A.2d at 194-95).

> The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Counsel's decisions will be considered reasonable if they effectuated his client's interests. We do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken.

*Commonwealth v. King*, 259 A.3d 511, 520 (Pa.Super. 2021) (quoting *Sandusky, supra* at 1043-44).

"To demonstrate prejudice, the petitioner must show that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding." *Commonwealth v. Spotz*, 624 Pa. 4, 33-34, 84 A.3d 294, 312 (2014) (internal citations and quotation marks omitted). "[A] criminal defendant alleging prejudice must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Hopkins, supra* at 876 (quoting *Commonwealth v. Chambers*, 570 Pa. 3, 33, 807 A.2d 872, 883 (2002)).

For claims of ineffectiveness based upon counsel's failure to call a witness:

> A defense attorney's failure to call certain witnesses does not constitute *per se* ineffectiveness. In establishing whether defense counsel was ineffective for failing to call witnesses, a defendant must prove the witnesses existed, the witnesses were ready and willing to testify, and the absence of the witnesses' testimony prejudiced petitioner and denied him a fair trial.

*Commonwealth v. Cox*, 603 Pa. 223, 267-68, 983 A.2d 666, 693 (2009) (internal citation omitted). A petitioner "must show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case." *Commonwealth v. Gibson*, 597 Pa. 402, 441, 951 A.2d 1110, 1134 (2008).

Instantly, trial counsel testified about utilizing Mr. Rosa-Ramos as a trial witness. Trial counsel explained that he hired a private investigator to

determine whether appropriate witnesses existed. Trial counsel became aware of Mr. Rosa-Ramos, and trial counsel testified that calling him as a trial witness was "a possibility" at first. (N.T. Hearing, 5/16/24, at 8). Thus, trial counsel "had an attorney go interview him and, you know, let him know he could be called as a witness." (*Id.*)

After trial commenced, however, trial counsel decided not to use Mr. Rosa-Ramos. Trial counsel suggested that the appearance of bias impacted his decision:

> Again, I went through my notes to figure out exactly why.
>
> Now, some of the things I would usually be thinking about. Is there bias? Is the witness coming out of custody? You know, things that could impact the jury. Those general, I guess, concerns that I thought about. Something to do with maybe bias, that they're friends.

(*Id.* at 31). Later, the court asked trial counsel to elaborate on why he did not call Mr. Rosa-Ramos. Trial counsel explained, "Other than maybe I thought the case was going well enough that I didn't want to complicate things with a witness in custody." (*Id.* at 43). Trial counsel added that, as the trial progressed, he believed that the case was going well for Appellant, and "I was very surprised at the verdict." (*Id.*)

The PCRA court considered these responses and determined that Appellant could not meet his burden to demonstrate that trial counsel lacked a reasonable basis for deciding not to call Mr. Rosa-Ramos:

> At the time the [c]ourt initially granted [PCRA relief] on May 22, 2024, and concluded that [trial counsel] was unable to

provide a basis for declining to call Mr. Rosa-Ramos as a witness, the notes of testimony for [Appellant's] first evidentiary hearing were not yet available. Unfortunately, the [c]ourt only recalled one of [trial counsel's] explanations as to why he did not call Mr. Rosa-Ramos as a witness, that is, because [trial counsel] felt that the defense was going to prevail and did not want to complicate the case. Upon review of the notes of testimony, it is clear that [trial counsel] was able to provide another reason as to why he likely did not call Mr. Rosa-Ramos to testify, that is, because [trial counsel] was concerned about the appearance of bias since Mr. Rosa-Ramos and [Appellant] were friends.

Unquestionably, when an experienced criminal defense attorney, such as [trial counsel], believes that the Commonwealth has not proven its case and that a not-guilty verdict is likely, there are grave risks associated with presenting any defense evidence. In particular, the presentation of a purported eyewitness who is in custody, and who is a friend of the defendant, may lead a juror who was ready to acquit the defendant to change his or her mind if it appears that defendant has called an unbelievable witness on his behalf.

Unfortunately, [trial counsel] had no clear recollection of his thought process. However, compelling circumstantial evidence presented at the hearing established that he made a reasonable strategic decision. Mr. Rosa-Ramos was downstairs at the [Criminal Justice Center] and ready to testify.[4] [Trial counsel] clearly believed a not-guilty verdict was likely without presenting any defense evidence, and the two bases he gave as the possible reasons for his decision were consistent with the thought process of an experienced defense attorney.

(PCRA Court Opinion, filed 11/13/24, at 15-16) (record citations omitted).

_____

[4] Mr. Rosa-Ramos testified that he was taken from custody in New Jersey and brought to Philadelphia for Appellant's trial. (*See* N.T. Hearing, 5/16/24, at 67-68). Trial counsel also confirmed that he was aware that Mr. Rosa-Ramos was in the courthouse at the time of Appellant's trial. (*Id.* at 8, 13-14).

- 13 -

The evidence of record supports the PCRA court's determination. *See Beatty, supra*. We reiterate that we do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken. *See King, supra*. Trial counsel adequately expressed his concerns over the appearance of bias from Mr. Rosa-Ramos. Likewise, trial counsel questioned the need for testimony from an incarcerated witness at a proceeding where trial counsel believed his client might receive a favorable outcome. These reasons demonstrate that counsel's chosen course was designed to effectuate his client's interests. *See Kelley, supra*. Thus, the failure to satisfy this prong of the test for ineffectiveness causes Appellant's first claim to fail. *See Chmiel, supra*.

Next, Appellant complains that trial counsel did not show Appellant the surveillance footage from the nightclub prior to trial. Without seeing the surveillance footage, Appellant maintains that he did not make an intelligent decision about testifying at trial:

> Specifically, by failing to review the video with [Appellant], trial counsel failed to … advise [Appellant] both about testifying that he was frisked prior to entering the A Lounge and showing the footage to the jury to confirm same. … The salience of such evidence is unassailable and the failure to consult with [Appellant] was so prejudicial that Appellant was denied a constitutionally fair trial.

(Appellant's Brief at 40-41). Appellant insists that this Court must recognize that he had a right to see the surveillance footage, and trial counsel should have discussed "how that evidence [fit] into his defense in conjunction with

- 14 -

[Appellant's] decision whether or not to testify." (*Id.* at 43). Absent more, Appellant concludes that trial counsel was ineffective in conjunction with Appellant's decision about whether to testify. We disagree.

"The decision of whether or not to testify on one's own behalf is ultimately to be made by the defendant after full consultation with counsel." *Commonwealth v. Michaud*, 70 A.3d 862, 869 (Pa.Super. 2013).

> In order to sustain a claim that counsel was ineffective for failing to advise the appellant of his rights in this regard, the appellant must demonstrate either that counsel interfered with his right to testify, or that counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf.

*Id.* (quoting *Commonwealth v. Nieves*, 560 Pa. 529, 533, 746 A.2d 1102 (2000)). Further,

> the appropriate standard for assessing whether a defendant was prejudiced by trial counsel's ineffectiveness regarding the waiver of his right to testify is whether the result of the waiver proceeding would have been different absent counsel's ineffectiveness, not whether the outcome of the trial itself would have been more favorable had the defendant taken the stand.

*Commonwealth v. Walker*, 110 A.3d 1000, 1005 (Pa.Super. 2015), *appeal denied*, 633 Pa. 756, 125 A.3d 777 (2015) (emphasis omitted).

Instantly, Appellant's testimony from the PCRA hearing addressed his decision not to testify at trial. While Appellant acknowledged that the trial court conducted a colloquy regarding his right to testify, Appellant emphasized that trial counsel "told me I was not going to testify and we were not going to call any witnesses." (N.T. Hearing, 5/16/24, at 84). Appellant also claimed

- 15 -

that trial counsel did not show him the nightclub's surveillance footage at any point prior to trial.

In analyzing this testimony, the PCRA court determined that Appellant could not demonstrate prejudice:

> [Appellant] never testified at the evidentiary hearing that, had [trial counsel] shown him the video, he would have testified at trial. Moreover, the fact that [Appellant] was patted down at some point prior to the shooting does not exculpate him. All of the people who may have been implicated in the shooting were patted down, and the shooter had ample time and opportunity to retrieve a firearm after leaving the club.

(PCRA Court Opinion, filed 11/13/24, at 16).

Our review of the record confirms that Appellant did not expressly state that he would have testified at trial if counsel had shown him the video in question. (*See* N.T. Hearing, 5/16/24, at 83-91). Assuming without deciding that trial counsel had some obligation to show the surveillance footage to Appellant, Appellant did not demonstrate that seeing the video would have caused him to testify at trial. *See Walker, supra*. We also observe Appellant's PCRA hearing testimony that he was with Mr. Rosa-Ramos on the night of the shooting, he remembered being frisked before entering the nightclub, and he told trial counsel about the frisk. (*See* N.T. Hearing, 5/16/24, at 86). This testimony showed that the surveillance footage did not actually bring new facts to light that were unknown to Appellant or counsel at the time of trial. The record makes clear that Appellant was aware of the pat down that occurred inside the nightclub, and he chose not to testify at trial

despite this knowledge. Thus, the evidence of record supported the court's finding about the voluntariness of Appellant's waiver of his right to testify, and trial counsel cannot be deemed ineffective on this basis. *See Hopkins, supra*; *Beatty, supra*.

Appellant also complains that the prosecutor inappropriately questioned Mr. Vicenty about his apprehension to testify against Appellant. Appellant maintains that this line of questioning resulted in the prosecutor making an improper comment about "the witness protection program" during his closing argument. (Appellant's Brief at 47) (quoting N.T. Trial, 5/3/18, at 81). Appellant insists that the record did not include evidence about any need for the witness protection program, and trial counsel should have moved for a mistrial on this basis.

> Ultimately, trial counsel's failure to request a mistrial allowed the jury to consider [Appellant's] fate poisoned with unfounded denigration that he would have caused the key witness to enter into witness protection. By failing to request a mistrial under such circumstances, petitioner suffered prejudice.

(*Id.* at 48) (footnote omitted). Further, Appellant argues that trial counsel had no reasonable basis for failing to request the mistrial, and he suffered additional prejudice because the issue of a mistrial was not properly preserved for appeal. Appellant concludes that trial counsel was ineffective for failing to request a mistrial. We disagree.

"In criminal trials, declaration of a mistrial serves to eliminate the negative effect wrought upon a defendant when prejudicial elements are

- 17 -

injected into the case or otherwise discovered at trial." ***Commonwealth v. Tucker***, 143 A.3d 955, 961 (Pa.Super. 2016), *appeal denied*, 641 Pa. 63, 165 A.3d 895 (2017).

> By nullifying the tainted process of the former trial and allowing a new trial to convene, declaration of a mistrial serves not only the defendant's interest but, equally important, the public's interest in fair trials designed to end in just judgments. Accordingly, the trial court is vested with discretion to grant a mistrial whenever the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial.

***Id.*** (quoting ***Commonwealth v. Jaynes***, 135 A.3d 606, 615 (Pa.Super. 2016)).

"With specific reference to a claim of prosecutorial misconduct in a closing statement, it is well settled that any challenged prosecutorial comment must not be viewed in isolation, but rather must be considered in the context in which it was offered." ***Commonwealth v. Jones***, 191 A.3d 830, 835 (Pa.Super. 2018).

> Thus, it is well settled that statements made by the prosecutor to the jury during closing argument will not form the basis for granting a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so they could not weigh the evidence objectively and render a true verdict. The appellate courts have recognized that not every unwise remark by an attorney amounts to misconduct or warrants the grant of a new trial. Additionally, like the defense, the prosecution is accorded reasonable latitude, may employ oratorical flair in arguing its version of the case to the jury, and may advance arguments supported by the evidence or use inferences that can reasonably be derived therefrom.

*Id.* at 835 (quoting ***Jaynes, supra*** at 615). "A prosecutor has great discretion during closing argument. Indeed, closing 'argument' is just that: argument." ***Commonwealth v. Brown***, 911 A.2d 576, 580 (Pa.Super. 2006), *appeal denied*, 591 Pa. 722, 920 A.2d 830 (2007).

Instantly, Mr. Vicenty's trial testimony addressed the circumstances surrounding his statement to the police. On direct examination, Mr. Vicenty indicated that he went to the police station for questioning in February 2015, a few weeks after the shooting. At that point, "everything is normal" in Mr. Vicenty's life, and he planned on staying in Philadelphia with his family. (N.T. Trial, 5/1/18, at 196). Five days later, Mr. Vicenty and his family left Philadelphia. (***See id.*** at 202). Mr. Vicenty only returned to Philadelphia to testify at Appellant's preliminary hearing and trial. (***Id.*** at 203). On redirect examination, Mr. Vicenty explained that he and his family abruptly left Philadelphia due to concerns over "safety." (***Id.*** at 247).

The prosecutor revisited this topic during his closing argument as follows:

> Four days after they talked to the police, four days after they talked to the police, they were gone. They didn't wait for the paperwork to get filed in the witness protection program. Hell, no. They left.

(N.T. Trial, 5/3/18, at 81). Trial counsel immediately objected. The court sustained the objection and issued a cautionary instruction. (***See id.*** at 81-82).

Although trial counsel did not make an additional request for a mistrial,

the PCRA court concluded that such a request would have been unsuccessful:

> Here, while it is true that the prosecutor made a single reference to the witness protection program, after defense counsel immediately objected, the [c]ourt not only sustained the objection, but contemporaneously advised the jury that "there's no evidence of witness protection in the case…." Under these circumstances, any motion for a mistrial would have properly been denied.

(PCRA Court Opinion, filed 2/18/25, at 10-11) (internal citations omitted).

*See also Commonwealth v. Goods*, 265 A.3d 662, 672 (Pa.Super. 2021) (reiterating that jurors are presumed to follow trial court's cautionary instructions). Here, the prosecutor's reference to the witness protection program could not have had the unavoidable effect of prejudicing the jury to a point where it could not objectively weigh the evidence. *See Jones, supra*. As such, we agree that a mistrial motion would have failed, and there is no arguable merit to this claim of ineffectiveness. *See Jones, supra*; *Poplawski, supra*.

In his final issue, Appellant suggests that he is entitled to relief based upon the theory that his claims cumulatively undermine confidence in the convictions. Nevertheless, "no number of failed ineffectiveness claims may collectively warrant relief if they fail to do so individually. When the failure of individual claims is based upon a lack of prejudice, however, then the cumulative prejudice from those individual claims may properly be assessed." *Commonwealth v. Elliott*, 622 Pa. 236, 294, 80 A.3d 415, 450 (2013), *cert. denied*, 574 U.S. 828, 135 S.Ct. 50, 190 L.Ed.2d 54 (2014) (internal citations

omitted). Here, we have rejected only one of Appellant's claims based upon the prejudice prong of the test for ineffectiveness. Thus, there can be no aggregation of prejudice from multiple ineffectiveness claims, and Appellant's claim of cumulative error fails. *See id.* Accordingly, we affirm the order dismissing the PCRA petition.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/19/2025